(No. 20696.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* DWIGHT ORGAN, Plaintiff in Error.

*Opinion filed October 23, 1931.*

340

KANE, SCOTT & KANE, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, D. F. RUMSEY, State's Attorney, JOHN P. MADDEN, and S. D. WISE, for the People.

Mr. JUSTICE HEARD delivered the opinion of the court:

Plaintiff in error, Dwight Organ, was indicted in the circuit court of Saline county for the murder of Leslie C. Lightfoot. He was convicted and sentenced for manslaughter and brings the record here for review on writ of error.

Plaintiff in error was engaged to teach what is known as the Thompson school for the year 1929, commencing August 19, by deceased and Emra Nolan and Robert Sullivan, who were the school directors of the district. There were two teachers of the school—a Miss Joyner, teaching the first to fourth grades, inclusive, and plaintiff in error,

who was superintendent, taught the higher grades and acted as purchasing agent for the district. Deceased was a school teacher and taught the Duncan school, about eight miles distant from the Thompson school. As a side line he sold school supplies, and about the time the Thompson school commenced he secured an order from plaintiff in error for school supplies for the district. They had known each other for three or four years and their relations had always been friendly until about October 6, when deceased presented a bill to the board for the supplies purchased from him, which plaintiff in error refused to approve by reason of an overcharge of $20. There is evidence tending to show that this greatly enraged deceased and that at various times thereafter he used vile and opprobrious epithets toward plaintiff in error and threatened to kill him. Several letters of a critical and satirical nature passed between them, each reflecting upon the other's knowledge of the English language and his ability as a teacher.

For some time prior to Thanksgiving Day plaintiff in error and Miss Joyner had been engaged in arranging a program for an entertainment to be given by the pupils on the afternoon of Wednesday before Thanksgiving and in drilling the pupils for the same. Deceased had also been engaged in preparing a Thanksgiving Day program for his school. On the Thursday evening before the entertainment was to be given, deceased met Miss Joyner at a teachers' meeting in Harrisburg and had a conversation with her, with reference to which, when called as a witness by the State, she testified: "Mr. Lightfoot asked me if I was agreeable to him bringing up his part of the program and putting with mine and charging an admission on Friday in order to pay for some school supplies and material. I told him it was agreeable with me, and in that conversation I asked Mr. Lightfoot if he had seen Mr. Organ about it, and he made a sneering grin and said, 'What would a damn fool like him know about it anyway?' or that in substance.

Mr. Lightfoot also said to me, 'Mr. Organ won't be there to teach out the remainder of the term,' or this in substance."

Plaintiff in error testified that the first he knew of the proposed change in the time and character of the entertainment was on the following Monday morning, when Carlyle Lightfoot, a son of deceased, came with a handful of bills and started to distribute them in the school. After examining the bills plaintiff in error sent them back to deceased with a note stating that he did not wish to have the bills distributed until he had corporate orders. On Monday evening he went to see Nolan and Sullivan, who each told him they did not care when he had the program and that he could have it whenever he wanted it or thought best. On Tuesday morning, Mrs. Lightfoot came to the school house with two letters, one signed by the three members of the board, ordering that the entertainment be held Friday evening and accusing plaintiff in error of attempting to run the board's business. After reading its letter plaintiff in error informed Mrs. Lightfoot either, as testified by her, that the members of the board had not signed the order, or, as testified by him, that he did not believe that they had signed it understanding its contents. The other letter was a personal one from Lightfoot, containing the following: "I am sending you herewith 'corporate orders,' as per your request. Please abide by the same and greatly oblige the writer. I have also been told the remarks you made to the school with reference to this matter. I also understand that you have called me a black liar. Please be prepared to back this remark to the limit. Why were you not man enough to tell me this when I spoke to you yesterday? Why did you abuse my little boy merely because he had a handful of bills? Do you remember me asking you, the evening you called to get your school warrant, about the program? Do you remember advising me that Miss Joyner was giving a program and that you were not having anything to do with it? Do you remember me talking

to you about the identical program we are to give? Yes, you remember our conversation. I shall talk to you personally with reference to this matter the first opportunity." There is no evidence that plaintiff in error at any time called deceased a black liar. Carlyle Lightfoot, testifying as a witness for the State, stated that he told plaintiff in error that he had some bills which his father gave him, and that plaintiff in error took the bills and told witness to go on out and play; that when school was called plaintiff in error said that he was not going to distribute the bills to the school for the reason that Lightfoot had not made up the program and he would not distribute them until he got corporate orders. He testified to no abuse or disrespectful treatment, and there was nothing in the evidence showing that the remarks made to the school were disrespectful or in any way reflected upon deceased.

After receiving the letters plaintiff in error wrote to Nolan and Sullivan calling an informal meeting of the board at Abney's restaurant, in Carrier Mills, the usual place for holding board meetings, stating to each of them that he did not believe that they had signed the letter knowing its contents. He also wrote to deceased, stating, "I wish you to be at Abney's to-night and read that letter to me and before the board." About six o'clock that evening plaintiff in error went to the restaurant and shortly thereafter was joined by Nolan and they seated themselves at a table next to the door, Nolan on the east side of the table and Organ on the south side. About five or ten minutes thereafter deceased and Sullivan came in and seated themselves at the same table, deceased on the west and Sullivan on the north side. This table was about twenty-four inches square and about forty inches high. The seats of the chairs at the table were about sixteen or eighteen inches high. After they were seated deceased asked plaintiff in error for the paper. Plaintiff in error gave it to him without saying anything and deceased read it aloud. Deceased then asked Sullivan

if he had signed it, and he said that he had. He was then asked if he understood it, and he said that he did. Deceased then asked Nolan if he had signed it, and he said that he had. Nolan said that there were some points in it which he did not catch. Deceased asked what they were, and Nolan took the paper and tried to read it but could not, as he did not have any glasses. The evidence of both Nolan and Sullivan shows that they did not understand it at the time they signed it. When Nolan took the note deceased asked plaintiff in error if he did not tell his (deceased's) wife that the directors had not signed it, and plaintiff in error either said that he did, or that he did not believe that they had signed it. When plaintiff in error made this reply deceased struck him a violent blow in the left eye with his fist and kicked him on the shin. The blow on the eye had the effect of discoloring and half closing it and plaintiff in error had a mark of the kick on his shin at the time of the trial. There is a conflict in the evidence as to what happened next. Ernest Thompson, who was a bank janitor and deputy sheriff, testified that when deceased hit plaintiff in error the latter got about half way out of his chair, pulled out a 25-caliber automatic Colt pistol from his pocket and shot deceased twice; that plaintiff in error was about half way out of his chair and deceased was sitting down in the chair when the shooting took place; that deceased's hands were in front of him; that after the shots were fired the deceased grabbed a chair and started after the plaintiff in error. There is evidence to the effect that immediately after striking plaintiff in error, deceased, starting to rise, grabbed the chair upon which he was sitting and had lifted it from the floor at the time the first shot was fired. Plaintiff in error testified: "When he reached back to get the chair I thought he was going for his gun. I just saw about that much of the round part of the chair as it went up. I thought it was a gun. Up to that time I had not struck nor attempted to strike Mr. Lightfoot. I had not

ever advanced in any manner or made any move toward Mr. Lightfoot. After all this occurred I pulled out a gun and shot. I don't know how many times. They say twice. I was so excited and scared I do not know. After Lightfoot reached back and got hold of the chair and brought it up, hitting at me, I threw up this arm and he hit me with the chair and skinned it. When he came up I backed up and he followed me, hitting me with the chair. All the hide was knocked off from about eight inches from the wrist to the elbow. That was the same wounds and bruises testified to by the doctor who examined them the next morning. He knocked me back in the window and then hit me another lick, and the last lick he struck he hit a light bulb and broke it. I fired these two shots because he threatened me and I was afraid of him. I wanted to protect myself. I did not want to kill him. I was just trying to protect myself." While at the time of the shooting plaintiff in error was six feet in height, his system was, as the doctor who had been treating him for a considerable time testified, "all run down" and he only weighed 125 or 126 pounds. Deceased, while not as tall, was of an athletic build, considerably heavier and apparently in good health.

We have not purported to give the entire evidence in detail but only sufficient to show that the case was a close one on the facts and that it was not one of those cases where the jury could not reasonably have found a verdict other than the one which they did, and that, therefore, it was highly important that the jury should be accurately instructed as to the law of the case. Defendant admitted the killing, and his only defense was that it was done in self-defense. At the request of the State's attorney the court gave to the jury, among others, the following instructions:

"You are further instructed by the court that if you believe from the evidence beyond a reasonable doubt that the difficulty which resulted in the shooting of Leslie C. Lightfoot by the said Dwight Organ was brought on by the said

Dwight Organ for the purpose of shooting the said Leslie C. Lightfoot, then you are instructed that the said Dwight Organ cannot justify the shooting of the said Leslie C. Lightfoot on the grounds of self defense, provided you believe from the evidence beyond a reasonable doubt that the said Dwight Organ did shoot the said Leslie C. Lightfoot, unless you further believe from the evidence that the said Dwight Organ before the shots were fired declined further difficulty with the said Leslie C. Lightfoot."

"You are instructed by the court that while the law of self-defense is a part of the law of this State, yet, you are further instructed that if a defendant has sought and brought on a difficulty, he cannot invoke the law of self defense unless he has in good faith declined further struggle or difficulty before the mortal wound was given; and you are further instructed that if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant, Dwight Organ, sought and brought on a difficulty between himself and the deceased, Leslie C. Lightfoot, then you are instructed that he cannot invoke the law of self-defense, unless you further believe from the evidence that the said Dwight Organ had in good faith declined further struggle or difficulty before the mortal wound was given, provided you believe from the evidence, beyond a reasonable doubt, that a mortal wound was given the said Leslie C. Lightfoot by the said Dwight Organ."

There is no evidence in the record upon which to base either of these instructions. The undisputed evidence is that up to the time deceased struck plaintiff in error with his fist plaintiff in error had not made any demonstration toward him, said nothing whatever on that occasion to provoke an assault, or in any manner sought and brought on a difficulty between himself and the deceased or done anything which would prevent him from invoking the law of self-defense. The only effect which the giving of this instruction could have would be to mislead the jury. The State in its brief

and argument upon this subject says: "The word 'difficulty' has been defined to mean 'controversy,' 'falling out,' or 'disagreement.'" If counsel for the State had this understanding of the word and argued it to the jury it might well be that the jury understood from this instruction that by reason of the fact that plaintiff in error called a meeting for the purpose of considering the order in question he had sought and brought on the difficulty—*i.e.*, a controversy, falling out or disagreement—and that therefore by so doing he had barred himself from invoking the law of self-defense. Instructions should not only state the law correctly, but they should be applicable to the case and give the jury to understand what the law is that is applicable to the case, and the giving of an instruction not so applicable and which has a tendency to mislead the jury is prejudicial and reversible error. *People* v. *Black*, 309 Ill. 354.

Plaintiff in error requested the court to give the jury the following instruction:

"You are instructed that if you believe from the evidence, that at the time the defendant fired the fatal shots, Leslie Lightfoot had assaulted and struck the defendant, and that he was attempting further to assault the defendant, and the defendant, in good faith, thought that he was in danger of either losing his life or suffering great bodily harm at the hands of the said Leslie Lightfoot, and in good faith thought that it was necessary, or that it was apparently necessary for him to fire the shots in question, in order to prevent his receiving great bodily harm or being killed; or if you have any reasonable doubt upon this question, you should find the defendant not guilty."

This instruction the court refused to give the jury but modified the same by inserting the words "with a deadly weapon" after the words "and that he was attempting further to assault the defendant." In order to justify killing in self-defense it is not true that there must be used against the slayer what is commonly understood to be of itself a

deadly weapon. It is sufficient if he was confronted with such means of force as to induce a reasonable apprehension that he was in danger of loss of life or great bodily harm. (*Waller* v. *State,* 44 So. 825.) It is not necessary that the danger be real or that the assailant be actually armed with any weapon. A person pursued or assaulted in such a way as to induce in him a reasonable and well-founded belief that he is actually in danger of losing his life or receiving great bodily harm, will, under the influence of such apprehension, be justified in defending himself whether the danger is real or only apparent. A man when threatened with danger must determine from appearances and the actual state of things surrounding him as to the necessity of resorting to self-defense, and if he acts from a reasonable and honest conviction he will not be held responsible criminally for a mistake as to the actual danger where other judicious men would have been likewise mistaken. (*People* v. *Scott,* 284 Ill. 465; *People* v. *Sinnot,* 274 id. 184; *Campbell* v. *People,* 16 id. 17.) Actual and positive danger is not indispensable to justify self-defense, but if the circumstances are such as to induce in the accused a reasonable belief that he is actually in present danger of losing his life or receiving great bodily harm he will be justified in defending himself, whether the danger is real or only apparent. (*People* v. *Stapleton,* 300 Ill. 471; *People* v. *Williams,* 240 id. 633; *Kinney* v. *People,* 108 id. 519.) The instruction as requested stated the law correctly and its modification was error.

Other questions are raised upon the record, but as they are such as are not likely to arise upon another trial we have not considered them.

The judgment of the circuit court is reversed and the cause remanded.

*Reversed and remanded.*