The People of the State of Illinois, Plaintiff-Appellee, *v.* Norman Schwartz, Defendant-Appellant.

(No. 57421; ▮▮▮▮▮▮▮▮▮▮)

First District (4th Division)—May 9, 1973.

Harry J. Busch, Sherman C. Magidson, and Marvin D. Michaels, all of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago, (Elmer C. Kissane, Patricia C. Bobb, and Mark T. Zubor, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE ADESKO delivered the opinion of the court:

The defendant, Norman Schwartz, was indicted for the crime of murder of Dr. Enrique Fuentes, to which he pleaded not guilty. In a bench trial defendant was found guilty of voluntary manslaughter and sentenced to the penitentiary for a term of 4 to 14 years. On appeal defendant contends:

(1) That he was not proven guilty beyond a reasonable doubt;

(2) That the trial court improperly excluded testimony regarding the nature and contents of a telephone conversation defendant had with his wife shortly before the shooting;

(3) That the trial court erred in permitting certain rebuttal testimony introduced by the State; and

(4) That the trial court erred in permitting a police officer to describe certain items which had been taken from the defendant, but which were not introduced in evidence or preserved by the State.

The facts are as follows:

Dr. Fuentes and Dr. Schwartz first became acquainted in 1962, when Dr. Fuentes applied for a position in the medical partnership of Dr. Kenneth Gill and Dr. Schwartz. Dr. Fuentes was hired and continued his employment-association with the partnership until early 1970. At times during their relationship, Dr. Schwartz had occasion to criticize Dr. Fuentes' medical procedures. Nevertheless, Dr. Fuentes continued to be employed by the partnership on a year-to-year contractual basis, beginning on the first of the year and ending on December 31st. In October, 1969, Dr. Fuentes engaged Dr. Schwartz in a conversation in which Dr. Fuentes demanded participation in the partnership. Dr. Schwartz responded that they would be willing to allow this participation if Dr. Fuentes made an investment in the partnership, as he had done. Dr. Fuentes replied that he did not want to invest any money, but that he wanted participation or he would leave. When Dr. Fuentes made this threat, Dr. Schwartz requested that he and Dr. Gill be given notice of exactly when Dr. Fuentes intended to leave. Dr. Fuentes said he had not completed his future plans as yet and he would let them know as soon as he did so. At this point, Dr. Schwartz told Dr. Fuentes that he could use the facilities of the medical center, that he would be paid for his services and that he expected to receive at least 30 days notice prior to Dr. Fuentes' leaving. The conversation concluded with Dr. Fuentes promising to give Dr. Gill and Dr. Schwartz "plenty of notice."

Dr. Schwartz did not receive any notice from Dr. Fuentes in the succeeding months. Dr. Fuentes left some time toward the beginning of

November, but returned at the beginning of December. His contract was not renewed on December 31, but he remained in the office after the first of the year. He was paid for his services on a per-patient basis. Dr. Fuentes left again for approximately 2 weeks some time during January or February but returned before the end of February.

On Tuesday, March 3, Dr. Schwartz was advised for the first time by an employee of the medical center that Dr. Fuentes had left the office on Saturday, February 28, saying he was not returning. When Dr. Schwartz inquired concerning Dr. Fuentes' whereabouts, he learned that Dr. Fuentes was out of town and was scheduled to work in the emergency room at St. Francis Hospital on April 2.

Dr. Schwartz went to the hospital on April 4 and saw Dr. Fuentes in a doctors' room in the emergency area complex. Dr. Schwartz was dressed in his street clothing, and carried on his person, as he always did when dressed in his street clothing, his gun and knife. He gave Dr. Fuentes the original of a letter regarding the status of Dr. Fuentes' professional insurance. He told Fuentes that he had brought the letter to him in person because of Fuentes' habit of desregarding his mail and his concern that Fuentes knew that, according to the contents of the letter, the Gill-Schwartz partnership would no longer pay the premiums on Dr. Fuentes' insurance.

During this same conversation, Dr. Schwartz and Fuentes discussed what would be done regarding the referral of Dr. Fuentes' patients. The conversation, from Dr. Schwartz' point of view, concluded on an apparently amicable basis. A hospital dinner was held on the evening of April 5. Dr. Schwartz and his wife were too tired to attend that dinner. Later the next day, however, while Dr. Schwartz was at the hospital, he learned from his wife that someone who had attended the dinner had heard Dr. Fuentes making derogatory remarks at the dinner concerning Dr. Schwartz. This knowledge prompted Dr. Schwartz to seek out Dr. Fuentes on the morning of April 6.

Dr. Schwartz arrived at St. Francis Hospital at approximately 7:15 A.M. He wore normal street clothes. He entered the hospital from the parking lot in the front, checked in at the doctors' bulletin board, hung his outer coat on a coat rack, checked his mail box, took an elevator to the second floor, where he dropped off a throat culture in the pathology lab, and then went to the doctors' locker room, which was also on the second floor. As he was scheduled to assist Dr. Santos in surgery at 8 A.M. that morning, Dr. Schwartz changed from his street clothing into a hospital surgical scrub suit in the locker room. Dr. Schwartz shared a locker with another doctor. He hung his sport jacket, his tie and his shirt on a hook in his half of the locker. He then removed his street shoes and placed

them in the bottom of the locker. Prior to removing his trousers, which were also to be hung on the hook in the locker, he removed a gun and knife he carried in his trousers pocket and folded them in a towel which he kept in the locker. This was done so that the weight of these objects would not pull the trousers from the hook in the locker.

Dr. Schwartz had owned a pistol for a number of years prior to April 6. In approximately 1965, he had purchased a .25 caliber automatic. Because of house calls he had to make at night, in dark and desolate areas where there had been assaults, because he carried his medical bag containing narcotics with him during these hours, and because he also made late-hour emergency calls at the hospital or his office, where he had been fired upon one late evening in November or December, 1969, Dr. Schwartz habitually carried the pistol on his person for a number of years. Dr. Schwartz had also carried a pocket knife on his person for a number of years. He used this knife to open packages in his home or in the office. Some time in 1967 he lost this knife. Shortly thereafter, he found another knife in the hospital parking lot. The blade of this knife moved in and out of the handle by means of a sliding button. When Dr. Schwartz found the knife, he placed a piece of masking tape in front of the button, so that the knife would not open accidentally. The masking tape was on the knife on the morning of April 6 when Dr. Schwartz entered the hospital. He did not remove it at any time that morning. When the knife was turned over to Sgt. Kooyenga later that day, the masking tape was in place, preventing the knife from being opened.

After replacing the towel containing the knife and the gun in his locker on top of his street shoes, Dr. Schwartz hung his trousers on a hook in the locker, closed his locker and dressed in the usual surgical scrub outfit. The pants to that outfit, as with all surgical outfits, had no pockets. At that time he did not have any intention of seeing Dr. Fuentes. Upon learning that Dr. Santos, whom he was scheduled to assist in surgery, was delayed, Dr. Schwartz made a telephone call to Attorney Henry Gentile concerning matters unrelated to Dr. Fuentes. He made an appointment with Mr. Gentile for late that evening. Following the telephone call Dr. Schwartz started his hospital rounds. He interrupted these rounds at approximately 8:15 A.M., to attend surgery. He remained in surgery until approximately 11:15 A.M., when the surgery was almost concluded. Dr. Schwartz did not leave surgery at any time between 8:15 and 11:15 that morning.

Judith Radzik, a nurse on duty in the emergency room on the morning of April 6, said that she saw Dr. Schwartz in the emergency room at approximately 9 A.M. Dr. Schwartz asked to see Dr. Fuentes and was told by either Mrs. Radzik or one of the other staff members present that

Dr. Fuentes was not there at the time. Mrs. Radzik said she recalled that Dr. Schwartz had inquired about Dr. Fuentes at 9 o'clock because she had happened to look at the clock to note the time she gave medication or when she had received a doctor's orders to administer medication, at about that time.

Edith Young, who was also on nursing duty in the emergency room that morning, said she saw Dr. Schwartz prior to 11 A.M., but could not recall the time. Miss Young said that Dr. Schwartz asked where Dr. Fuentes was, she told him Fuentes was not there, and Dr. Schwartz left the area. Miss Young also said she saw Dr. Schwartz on two other occasions later that morning.

After Dr. Schwartz left surgery at approximately 11:15 A.M., he went to the first floor and made a telephone call to his office. Following this call he went to a committee meeting on the first floor, where he remained for a short period of time, as he was in a hurry to get back to his office. After leaving the meeting he went to the emergency room to see and talk to Dr. Fuentes. He estimated he arrived there some time between 11 A.M. and 11:30 A.M. Upon arriving in the emergency room area, he asked one of the women there for Dr. Fuentes. Miss Young said that Dr. Schwartz left the emergency room. She estimated the time at between 10:30 and 11:30 A.M.

Dr. Schwartz also saw Dr. Mejicano, with whom Dr. Fuentes had started a private practice, in the emergency room at that time. Mejicano was in attendance in the emergency room from approximately 9:00 A.M. because of Dr. Fuentes' appointment with a physical therapist. Dr. Mejicano testified that between 10:00 and 11:00 A.M. Dr. Schwartz came into the emergency room area and inquired for Dr. Fuentes. Dr. Mejicano told Dr. Schwartz that Fuentes had gone to therapy for one of his knees and that he would return at noontime. The two doctors then left the area together and walked to the elevators. They rode to the second, or surgical, floor where Dr. Schwartz exited. Dr. Mejicano continued to the sixth floor. On their way to, or on, the elevators, the two doctors exchanged trivial pleasantries. During their conversation, Dr. Schwartz asked Dr. Mejicano if he or Dr. Fuentes would take over the emergency room duty for him on his birthday later that month. Dr. Mejicano replied he would be glad to do so. Dr. Schwartz estimated it was approximately 11:30 when he left Dr. Mejicano and went to the recovery room to look in on his surgical patient. Following that, he made his rounds through the hospital. After visiting one patient of Dr. Gill (who was on vacation at the time), he met Dr. Thomsen.

Dr. Schwartz placed this meeting at sometime before noon. Dr. Thomsen said it occurred at approximately 11:00 A.M. The two men went

into a treatment room where Dr. Schwartz sought Dr. Thomsen's counsel on internal problems involving his medical partnership. According to Thomsen, Dr. Schwartz complained about being overworked due to Dr. Fuentes' having left and Dr. Gill's many vacations and inattention to the practice. He also ascribed some of his problems to Dr. Fuentes. He complained about receiving anonymous threatening telephone calls and being harassed. Dr. Schwartz told Dr. Thomsen he had an appointment later that evening with an attorney, and Dr. Thomsen advised him to discuss everything with the attorney and try to get some help. Dr. Schwartz also told Dr. Thomsen about his having heard that Dr. Fuentes had made derogatory remarks concerning him the previous evening, and about his having tried to see Fuentes about these remarks. Thomsen counseled Dr. Schwartz to speak to the attorney about these matters, as well as about the threatening telephone calls, the slashed tires, and the other harassing incidents which Dr. Schwartz described. Dr. Schwartz continued making his hospital rounds after he left Dr. Thomsen. He visited a patient in the old section of the hospital, made a telephone call to his office to inform them he was returning, walked back to the new section of the hospital, and stopped in the emergency room area to see Dr. Fuentes. Upon being told that Dr. Fuentes was not in the area, Dr. Schwartz returned to the second floor locker room to change from his surgical garb.

As Dr. Schwartz sat in front of his locker reaching for his street shoes, he was paged and the telephone rang simultaneously. He got up, walked several feet to the telephone, and answered the page. At that time, he had the towel containing his gun and knife, which he had unconsciously picked up in his hands. Immediately after answering his page, which had advised him that Dr. Fuentes was back in the emergency room, Dr. Schwartz walked to the elevators and went down to the emergency room area. As Dr. Schwartz entered the emergency room area he walked past a bank of treatment rooms to the nurses' station, where he asked for Dr. Fuentes. Someone in the station responded he was in one of the treatment rooms. Mrs. Radzik said that she was on duty in the nurses' station at this time. She was talking on the telephone when Dr. Schwartz inquired about Dr. Fuentes, and she pointed with her right hand, indicating that Fuentes was in the doctors' lounge. Dr. Schwartz then walked toward the doctors' lounge which was west of the nurses' station. Dr. Schwartz denied that he walked toward the lounge. Instead, he said, he walked toward the treatment rooms which were in the opposite direction from the lounge.

Nurse Young was assisting Dr. Fuentes with a patient in treatment room No. 3 at this time. Dr. Schwartz entered the treatment room and

told Dr. Fuentes he wanted to see him. Fuentes said he was busy and would see Dr. Schwartz when he was finished. Dr. Schwartz said he wanted to see him then, and Dr. Fuentes replied he would be able to see him when he was through. Dr. Schwartz again said he wanted to see Dr. Fuentes right then, and Fuentes said he would be with him. Dr. Schwartz then left the treatment room. After a few moments Dr. Schwartz again opened the door, stood in the doorway, and began counting. Miss Young described him as being "abrupt" and "demanding" at this time. Dr. Schwartz explained that when he is rushed and pushed for time, as he was on this occasion, he had the habit of counting aloud to himself.

As Dr. Fuentes joined Dr. Schwartz in the hallway outside the treatment room, he asked Dr. Schwartz why he wanted to see him. Dr. Schwartz explained that he had tried to see Dr. Fuentes earlier that morning to talk to him. When Dr. Fuentes asked about what, Dr. Schwartz replied that he had heard Dr. Fuentes had made some derogatory remarks about him at the hospital dinner the previous evening. Dr. Fuentes denied making any remarks. Dr. Schwartz explained that, when they had parted company the previous Saturday, it had been, from his point of view, as friends; but he had heard from a very reliable source that Dr. Fuentes had made derogatory remarks about him. When Dr. Schwartz asked to know what was happening and to settle the matter then, Dr. Fuentes directed him to follow him to where they could talk "privately." Dr. Schwartz followed Dr. Fuentes to the doctors' lounge.

Edith Young heard Dr. Fuentes' and Dr. Schwartz' voices after Dr. Fuentes left treatment room 3. Before the door to the room closed automatically, she saw Dr. Fuentes join Dr. Schwartz and the two men walked away abreast of one another. They were talking, loudly, but "not really loud." She said the voices must have been above a conversational level or she would not have been able to hear them through the door of the treatment room which was closed. Neither voice, to her, was more distinct, and she could not distinguish what was said.

George Schuma, who had been in an accident earlier that morning with Pasquale Feretta and who was waiting to be treated in an examining room in the emergency area, heard a Spanish and an American sounding voice arguing from outside the room he was in. He could understand the American voice, but not the Spanish voice because it was deep, muffled and heavily accented. The first words he understood were the American voice saying, "We're going to settle this now. I have talked to other doctors about this." These words were louder than the other words Schuma had heard up to this point. After a "moment or so," Schuma heard the Spanish voice say something, but he could not distinguish what was said. Other sounds followed after a pause of "about

ten seconds or so." Mr. Feretta, who was in the business office in the emergency area at the time, did not hear anything unusual, although later he heard loud, hostile voices arguing and, concurrently, "what appeared * * * like thumping on the walls, like something was being hit against the wall."

Dr. Fuentes preceded Dr. Schwartz into the doctors' lounge, but stepped behind Dr. Schwartz to close the door to the lounge after both men were inside. Dr. Schwartz again asked Dr. Fuentes what he had against him and told him he was seeing his attorney later that evening and would take up these matters with the attorney. Dr. Fuentes responded: "I'll tell you what I have against you. You're the bastard that prevented me from getting a partnership." Dr. Schwartz replied that was ridiculous, and he explained that he had not prevented Fuentes from getting a partnership and that Fuentes could have had a partnership at any time merely by making the required investment. Dr. Fuentes said something unintelligible, and Dr. Schwartz added that he could only conclude that Dr. Fuentes was the person responsible for the harassing telephone calls and other incidents, referring to the slashing of his automobile tires. Dr. Fuentes said: "So what if I did make those remarks? So what if I did put somebody up? I'm going to show you how I'm going to settle you once and for all." With that, Fuentes grabbed Dr. Schwartz' wrist. As he did so, the towel, which had been under Dr. Schwartz' left armpit fell to the floor. Dr. Schwartz tried to pull away from Dr. Fuentes, saying, "Are you crazy? Take your hands off me." Dr. Schwartz twisted around and tried to get out of the room. Dr. Fuentes struck "a severe blow" to Dr. Schwartz' face, knocking Dr. Schwartz' head against the wall and causing Dr. Schwartz to become dizzy. Dr. Schwartz described what followed: "The next think I knew, he was all over me, he was punching me, clobbering me. My head was exploding. I screamed for help. I pleaded with him to leave me alone, to get away from me. But he kept pounding me back and forth. My head went back and forth against the wall." George Schuma heard Dr. Schwartz say, "Take your hands off me. Stop this. Stop it now," and scream for "Help" three or four times. Dr. Schwartz sounded like a man who was scared; his voice was shrill. Schuma believed he said, "Take your hands off me" three times. The screams for help and the shouts to "Stop it" were mixed in with scuffling, which sounded to Schuma like bodies bouncing off a wall. The screams, shouts and sounds of "bodies bouncing off the wall" prompted Schuma to go into the corridor to seek help. He came upon one, two or three nurses, whom he could not identify, and said: "There's a fight going on next door. It sounds like somebody is killing each other. You better stop it." The nurses told Schuma to go back into the exam-

ination room he had come from and "be quiet." Schuma did as he was told and returned back down the corridor to the room he had been in. Based on what he had heard coming from the doctors' lounge and from the fact that it sounded to him "like one man was really getting beat up," Schuma concluded that Dr. Fuentes was the aggressor.

Mrs. Radzik, who was standing with Miss Young in the hallway between the isolation and health service rooms, heard loud voices which she could not distinguish coming from the direction of the doctors' lounge, fifteen to twenty feet away. Pasquale Feretta, who was sitting in the business office at this time heard "very loud" and "hostile" male voices arguing. Concurrently, he heard "thumping on the walls, like something was being hit against the wall."

Dr. Schwartz testified further that as Dr. Fuentes beat his head against the wall, Dr. Fuentes forced him to the floor. Dr. Schwartz got up, and Fuentes continued the attack. He forced Dr. Schwartz to the floor again, and Dr. Schwartz fell on or near the gun which had been in the towel. He picked it up and told Dr. Fuentes to stay away from him, but Fuentes kept coming toward him. Dr. Schwartz again told Fuentes to stay away from him, and he fired the gun. Dr. Fuentes kept advancing and said: "I'm going to get you once and for all. I'm going to get both of you." Dr. Schwartz kept firing.

As Dr. Schwartz entered the hallway he passed Mr. Feretta. Feretta had heard three or four shots in rapid succession "immediately following the argument and thumping on the wall." Upon hearing these shots, Feretta put down a book he was reading, left the business office, and walked down the hallway to a pair of swinging doors that were closed at the time. A man was working on the doors. Feretta stood there for a minute or two, and Dr. Schwartz came through the doors and entered the hallway. As he came through the doors Dr. Schwartz appeared "dazed" and "groggy." Immediately upon coming out of the room, Dr. Schwartz turned north and started to walk away from Feretta. He made a U-turn and walked, "like a man who was drunk," back toward Feretta. He passed within six inches of Feretta. At that time Feretta observed Dr. Schwartz' face; the right side was swollen and had black and blue marks on it; his mouth and nose were bleeding "very badly." In addition Feretta noticed that the Doctor's right arm was bruised and scratched. Finally, Feretta saw blood on the green surgical shirt Dr. Schwartz was wearing. As Dr. Schwartz continued down the corridor he passed what appeared to Feretta to be a security officer. Feretta heard the Doctor tell the security officer, "you better call the police."

Nurse Radzik heard five or six shots coming from the direction of the doctors' lounge shortly after she had heard the loud voices coming from

that direction. The interval between the first and last shots was a matter of seconds; "[t]here were several fired in rapid succession, * * * a pause (of two, possibly three, seconds) and several more in rapid succession." After she heard these shots Mrs. Radzik turned to a secretary and told her to call the security guard and the police. She then went to the doctors' lounge where she saw Nurse Young and Dr. Dolehide working over Dr. Fuentes, who was lying face up diagonally to the south wall of the room.

The subsequent pathological examination revealed that Dr. Fuentes had been shot seven times. Mrs. Radzik immediately left the room to get emergency equipment and initiate an emergency call for other doctors. She returned to the lounge within a minute or two. On her way back she had a "fleeting glimpse" of Dr. Schwartz in the hallway leading from the main emergency area to the doctors' lounge. She did not pay too much attention to him. The only thing unusual about his appearance she could recall was "a small amount" of blood, two or three drops under his nose. She could not recall if she saw blood anywhere else on him, or whether he had any marks and bruises, but there might have been blood on his arms which she could not recall. She did see Dr. Schwartz holding a "bluish" colored turkish towel.

Nurse Young left Mrs. Radzik a minute or two after hearing the two doctors' voices coming from the direction of the lounge, but remained in the corridor. She then heard approximately five shots coming from the direction of the lounge; there were two shots, a brief pause of a "moment or two," and then more shots. Prior to the shots she did not hear anything else. After the shots, Miss Young heard the door to the lounge open. She walked towards the lounge and met Dr. Schwartz in the hall, coming from the lounge. He appeared "agitated," and exclaimed: "Call the police, Dr. Fuentes attacked me and I shot him."

Dr. Robert Dolehide was walking toward the doctors' lounge when he heard loud talking or arguing. He opened the door to the lounge and heard a volley of shots. He immediately ran approximately fifteen yards around the corner where he waited until he heard another volley of shots. These "vollies" were described by the doctor as consisting of two or three repetitive, sharp blurts, although he could not ascertain the number of shots he heard each time. The doctor "estimated" or "guessed" that five to ten seconds elapsed between the first volley and the second.

After hearing this second volley, Dr. Dolehide ran back towards the doctors' lounge, where he saw Dr. Schwartz emerging from the doorway. He said he noticed that Dr. Schwartz had "three or four drops of blood between [his] nose and [his] upper lip." He noticed a towel in one of Dr. Schwartz' hands and nothing unusual about the other hand.

Shortly after he had been taken into custody by Blue Island Police Sergeant Kooyenga, who had been called to the scene at 12:48 P.M. and had arrived within 12 minutes, Dr. Schwartz was examined by Dr. Thomsen of the St. Francis staff. This examination was prompted by Dr. Schwartz' request and Sergeant Kooyenga's suggestion that the doctor's injuries be examined. When he first took Dr. Schwartz into custody at the hospital, Sergeant Kooyenga, himself, had noticed blood around the doctor's mouth and nose. And, although he denied it at trial, Kooyenga had told the Coroner's Inquest that the doctor was holding the towel in his hands to his face from time to time, and he thought the doctor was using the towel to "stem the flow of blood from his mouth or nose." His initial view of the doctor caused the Sergeant to ask: "My God! What happened to you?" Dr. Schwartz replied that he wanted to tell the Sergeant "all about it," and the two men went from the hallway to a room where Dr. Schwartz told Kooyenga that he and Dr. Fuentes had "a terrific struggle" and that he had to shoot Fuentes. Also, according to Sergeant Kooyenga, it was in that room that Dr. Schwartz told Sergeant Kooyenga that he had confronted Fuentes about the harassment, that he and Fuentes had had a "terrific struggle," and that Fuentes had kicked him in the groin. Dr. Schwartz asked Kooyenga to make a note of this and the blood on his nose.

Sergeant Kooyenga initially said the towel, from which, according to Kooyenga's testimony, the Doctor withdrew his pistol after he first told Kooyenga he had to shoot Dr. Fuentes as a result of their struggle, contained "a small amount of blood," which Kooyenga defined as meaning less than being covered with blood. Called upon for a further description of the amount of blood on the towel, Kooyenga said there was more than two square inches of blood on the towel, but he could not tell whether there was more than three square inches on it. Kooyenga then took Dr. Schwartz from the room they were in to the area of the treatment rooms. As they walked, Dr. Schwartz said he wanted his injuries noted, and Kooyenga suggested he be examined for them. They went inside a treatment room. Once inside, Dr. Schwartz said, "You know, I also carry a knife." Kooyenga had said nothing about a knife prior to that time. He asked Dr. Schwartz where he had the knife, and, according to Kooyenga's testimony, Dr. Schwartz "reached in his right trouser pocket, * * * pulled a knife out, and handed it" to Kooyenga. The knife had a piece of masking tape over a button, which prevented the button from being pushed forward to release the blade. Kooyenga took the knife with him.

After recovering the knife, Kooyenga said he left Dr. Schwartz in the treatment room with the medical personnel and other policemen. Dr. Schwartz complained of injuries to his face, head, mouth and groin. Dr.

Thomsen examined these areas. He noted evidence of bruises and contusions on Dr. Schwartz' face and forehead. Dr. Schwartz also had a contusion or laceration of his mouth in which there was some bleeding. Following the examination, Dr. Thomsen asked Dr. Schwartz: "Norman, what have you done? Why didn't you go home and wait to see your attorney tonight?" Dr. Thomsen could not recall if Dr. Schwartz answered him. In Dr. Thomsen's opinion, Dr. Schwartz was in a state of "extreme agitation," "agitation enough to indicate mental shock" and a recent beating. Sergeant Kooyenga also noticed, after Dr. Schwartz had been locked up at the Blue Island Police Station, a discolored lump or bruise alongside the doctor's right eyebrow, and dried blood on his lips and around the bottom of his nose. Again the following morning, when the doctor was taken before a magistrate, Kooyenga noticed that his face was in the same condition as it was the day before.

In addition to the injuries noted above, Dr. Schwartz sustained a number of contusions to different parts of his body and two fractured teeth.

Defendant's first contention on appeal was that he was not proven guilty beyond a reasonable doubt. Section 9—2(b) of the Criminal Code provides:

> "A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." Ill. Rev. Stat. 1971, ch. 38, par. 9—2(b).

Section 7—1 of the Criminal Code provides in part:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, * * *." Ill. Rev. Stat., 1971, ch. 38, par. 7—1.

■■ In finding the defendant guilty of voluntary manslaughter, rather than guilty or not guilty or murder as charged in the indictment, the trial judge must have found that defendant believed that the killing of Dr. Fuentes would be justified or exonerated by the danger to his own person, but that this belief was unreasonable. Therefore, the issue is whether defendant's belief that deadly force was necessary to protect himself from death or great bodily harm was reasonable. Whether such

a belief is reasonable must necessarily depend upon the facts and circumstances surrounding its formulation.

The deceased was 5 feet 11 inches tall and weighed 173 pounds. Dr. Bono, a roommate of the deceased testified that Dr. Fuentes was in good physical condition and not crippled or deformed in any manner at the time in question. Dr. Schwartz described Dr. Fuentes as big, bony, muscular build, well developed, quite athletic, and this description was borne out by a photograph of Dr. Fuentes which was received into evidence.

■■ Defendant's version of the circumstances and events surrounding the shooting is substantially unimpaired by the witnesses' testimony. The testimony of the two disinterested witnesses, Feretta and Schuma, substantially corroborated defendant's testimony. In *People v. Lockett*, 85 Ill.App.2d 410, 229 N.E.2d 386, the court stated at page 414:

> "For a killing to be justifiable it is not necessary that the danger be real. If the defender had reasonable ground to believe himself in danger of losing his life or of suffering great bodily harm he may protect himself even if he is mistaken and the danger only apparent. Whether the danger is actual or apparent does not depend upon the assailant using a deadly weapon or having one in his possession. *People v. Motuzas*, 352 Ill. 340, 185 N.E. 614 (1933); *People v. Organ*, 345 Ill. 339, 178 N.E. 73 (1931)."

■■ Under the circumstances involved in this case, we are not prepared to say that defendant's belief that the use of deadly force to protect himself from death or great bodily harm was unreasonable. The proof was insufficient to support the conviction of voluntary manslaughter. In view of our conclusion, we need not reach the other issues raised on appeal.

For the reasons given, the judgment of the Circuit Court of Cook County is reversed.

Judgment reversed.

BURMAN, P. J., and DIERINGER, J., concur.